UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>JENNIFER LYNN KRIEGER,<br><br>    Defendant. | Case No. 06-cr-40001-JPG |

**MEMORANDUM AND ORDER**

**GILBERT, District Judge:**

This matter comes before the Court on defendant's motion to dismiss indictment or in the alternative motion in limine (Doc. 59). The government has responded to defendant's motion (Doc. 61), and defendant has replied to its response (Doc. 62). For the following reasons, the Court will **DENY** defendant's motion.

**BACKGROUND**

On January 5, 2006, a grand jury returned an indictment charging Jennifer Lynn Krieger with knowingly and intentionally distributing diverse amounts of fentanyl (a "Duragesic Patch"), a schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C). (Doc. 13). The indictment further charged that the fentanyl Krieger distributed to Jennifer Ann Curry caused Curry's death on November 23, 2005. (*Id*.). During discovery, the government produced an autopsy report prepared by Dr. John A. Heidingsfelder, a Forensic Pathologist. The report indicated that Dr. Heidingsfelder had taken certain physical samples from Curry during his autopsy, including blood, bile and urine. Dr. Heidingsfelder has since fled the country to avoid various unrelated legal problems.

The government has conducted DNA analysis on the samples "to attempt to re-establish a

chain of custody." (Doc. 61 at 2). It asserts that the analysis has confirmed the samples came from Curry and shows that she died of a lethal amount of fentanyl in her system. Krieger objects to the use at trial of any samples taken by Dr. Heidingsfelder. Defense counsel maintains that she is entitled to cross-examine Dr. Heidingsfelder "regarding the procedures and processes he utilized during the course of the autopsy, retrieval, and packaging of the samples." Relying on *Crawford v. Washington*, 541 U.S. 36 (2004), and Federal Rule of Evidence 901, counsel contends that Heidingsfelder's absence deprives Krieger of the right to confront the witnesses against her and creates an unassailable defect in the chain of custody. The government denies that Dr. Heidingsfelder's absence creates a *Crawford* issue and argues that whatever problems exist in the chain of custody go to the weight the jury is entitled to give to the physical evidence, rather than its admissibility.

## ANALYSIS

**I.     *Crawford* Claim**

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." In *Crawford*, the Supreme Court of the United States held that the Confrontation Clause does not allow "admission of testimonial statements of a witness who [does] not appear at trial unless he [is] unavailable to testify, and the defendant had . . . a prior opportunity for cross-examination." *Id*. at 50, 53-54 (finding "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused."). The Clause applies to both in-court and out-of-court testimony. *Id*. at 51. The requirement of a prior opportunity to cross-examine is dispositive; if the defendant did not have such an opportunity, the evidence is inadmissible. *Id*. at 53-54. While the Court declined to

provide a comprehensive definition of the term "testimonial," it concluded that, at the least, it covers "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id*. at 68.

In *Davis v. Washington*, 126 S.Ct. 2266, 2273 (2006), the Court reaffirmed that the Clause applies *only* to testimonial statements. *Crawford*, 541 U.S. at 41; *accord United States v. Ellis*, 460 F.3d 920, 923 (7th Cir. 2006). Though the Court again refused to provide a comprehensive definition of testimonial, its focus on the purposes for which statements are sought and what a reasonable declarant would think the purpose of his statement was, has provided a working framework for distinguishing between testimonial and non-testimonial statements. *Ellis*, 460 at 925 (collecting cases). *Davis* held that statements "made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency" are non-testimonial. 126 S.Ct. at 2273-74. On the other hand, statements made in the course of police interrogations are testimonial "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id*. Applying the definition for testimony given in *Crawford* – "a solemn declaration or affirmation made for the purpose of establishing or proving some fact" – the Court held that statements made in response to a police dispatcher's questions during a 911 call were not designed primarily to prove some past fact, and were thus non-testimonial. *Id*. at 2276, 2277 (quoting *Crawford*, 541 U.S. at 51).

In several recent cases, the Seventh Circuit Court of Appeals has elaborated on the distinction between testimonial and non-testimonial statements in light of *Crawford* and *Davis*. In *United States v. Ellis*, the court found that business records were non-testimonial statements.

460 F.3d at 924.  In distinguishing between testimonial and non-testimonial statements, the court focused on whether the declarant reasonably expected the statement "to be used prosecutorially." *Id*. at 925 (collecting cases); *see also United States v. Gilbertson*, 435 F.3d 790, 795 (7th Cir. 2006).  In *United States v. Tolliver*, 454 F.3d 660, 666 (7th Cir. 2006), the Court held that a written certification attesting to the authenticity of a business record was not testimonial evidence, reasoning that the attestation merely provided context for other admissible statements. *Id*. at 927 (citing *United States v. Gajo*, 290 F.3d 922, 930 (7th Cir. 2002)); *accord United States v. Nettles*, 476 F.3d 508, 517 (7th Cir. 2007).  The statement did not pose a confrontation problem because the attesting declarant was not a witness against the accused.  *Tolliver*, 454 F.3d at 666-67.

      The government claims it does not intend to introduce any testimonial statements of Dr. Heidingsfelder.  Counsel states, "The government intends to establish its chain of evidence with respect to the forensic exhibits by chain of custody documents from police departments, the medical examiner's office, and testing laboratories." (Doc. 61 at 3).  "The government also intends to buttress its chain of custody by presenting DNA evidence that will establish that the forensic exhibits in this case all came from Jennifer Curry." (*Id*.).  It thus appears the government only intends to offer the physical products of Dr. Heidingsfelder's investigation, not his reports or conclusions.  If this is the case, there is no *Crawford* issue – Krieger cannot reasonably claim this physical evidence is testimonial.

      Krieger attempts to construct a *Crawford* issue by emphasizing her prospective inability to cross-examine Dr. Heidingsfelder on the methods he used to procure and then secure the physical evidence from the autopsy.  She contends that his unavailability will deprive her of her right to confront this evidence.  There can be no doubt that, as Krieger suggests, the autopsy was

"conducted with an eye towards obtaining evidence of cause of death . . . for use in a criminal prosecution."  (Doc. 59 at 9).  Krieger offers no authority, however, supporting her claim that this fact transmogrifies physical evidence into testimonial evidence; the physical products of an autopsy cannot fit within any conceivable definition of testimonial.  While the Court is inclined to agree that the admission of Dr. Heidingsfelder's autopsy report would be impermissible under *Crawford*, it finds that the introduction of the physical products of that investigation will not present a *Crawford* issue.  Should the government attempt to introduce the autopsy report or related statements into evidence, the Court will entertain an objection under *Crawford*.

## II.     Chain of Custody

Federal Rule of Evidence 901 provides, in pertinent part: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  F.R.E. 901(a).  The Rule goes on to set forth, by way of illustration only, examples of authentication that comply with the Federal Rules.  F.R.E. 901(b).  The chain of custody requirement is properly considered a hybrid of several of these provisions.  *See generally* 5 WEINSTEIN'S FEDERAL EVIDENCE § 901.03[3] (2d ed. and 2006 Supplement).  In this Circuit, "The standard for the admission of exhibits into evidence is that there must be a showing that the physical exhibit being offered is in substantially the same condition as when the crime was committed." *United States v. Moore*, 425 F.3d 1061, 1071 (7th Cir. 2005) (internal quotation marks omitted); *United States v. Smith*, 308 F.3d 726, 739 (7th Cir. 2002); *United States v. Aviles*, 623 F.2d 1192, 1197 (7th Cir. 1980).  As stated in *Moore*:

> It is well accepted in this circuit that a perfect chain of custody is not a prerequisite to admission, as gaps in the chain normally go to the weight of the evidence rather than its admissibility.  Furthermore, the government need only

> show that it took reasonable precautions to preserve the original condition of the evidence, it does not have to exclude all possibilities of tampering with the evidence. A presumption of regularity exists with respect to official acts of public officers and, absent any evidence to the contrary, the court presumes that their official duties have been discharged properly.

*Moore*, 425 at 1071 (internal brackets, quotation marks, and citations omitted). If evidence is at all times kept in official custody, the presumption mentioned in *Moore* arises unless the defendant "can point to evidence that specifically raises the issue of tampering." *Smith*, 308 F.3d at 739; *see also United States v. Williams*, 44 F.3d 614, 618 (7th Cir. 1995) ("If the trial judge believes that there is a reasonable likelihood that the evidence has not been altered in a material regard, he may permit the introduction of the evidence.").

Krieger contends that Dr. Heidingsfelder's absence creates an incurable defect in the chain of custody. She focuses on the requirement that the evidence be substantially unchanged and contends that blood and other human tissue samples present special problems in this regard. *Robovsky v. Commonwealth*, 973 S.W.2d 6, 8 (Ky. 1998); *see also* Dale Joseph Gilsinger, Annotation, *Authentication of Blood Samples Taken From Human Body for Purposes Other than Determining Blood Alcohol Content*, 77 A.L.R.5TH 201, 201 (2000) ("When a blood specimen has been drawn for purposes of scientific analysis other than the determination of the blood's alcohol content, the proponent of the blood evidence ordinarily attempts to authenticate the sample tested by proving a chain of custody. This requires accounting for the sample's handling from the time it was first collected until the time it was analyzed. Unless the sample can be authenticated by other means, failure to make this accounting renders inadmissible the sample and any results of analysis of the sample.").

At this point, the Court is without sufficient evidence to make a conclusive determination as to the sufficiency of the chain of custody in this case. As there is no indication that the

evidence taken during the autopsy has ever been out of official custody, the Court must entertain a presumption of regularity. While Krieger suggests that Dr. Heidingsfelder's absence ensures that "there will be no testimony that the items are in a condition that is substantially unchanged and fairly representative of its past condition," the record does not compel this conclusion. It is certainly possible that another observed Dr. Heidingsfelder remove the specimens taken from Curry's body and transfer the evidence to the next link in the chain. Furthermore, that the government's pathologist has absconded does not necessarily mean that the government failed to take reasonable steps to observe the original condition of the samples. The record gives no information whatsoever on how the samples arrived to wherever they presently are.

Another consideration is the government's representation regarding the DNA match between the samples and Curry. Logically at least, it appears that this could serve as the "authenticat[ion] by other means" mentioned in the A.L.R. cited by Krieger. Without more information, the Court declines to grant Krieger's requests at this time.

## CONCLUSION

Defendant's motion (Doc. 59) is **DENIED**.

**IT IS SO ORDERED.**

**DATED: May 24, 2007**

                                         s/ J. Phil Gilbert
                                         **J. PHIL GILBERT**
                                         **DISTRICT JUDGE**