UNITED STATES OF AMERICA,

       Plaintiff,

     v.

JENNIFER LYNN KRIEGER,

       Defendant.

Case No. 06-cr-40001-JPG

## MEMORANDUM AND ORDER

On January 5, 2006, Jennifer Lynn Krieger was indicted on one count of knowingly and intentionally distributing divers amounts of fentanyl, a schedule II controlled substance, with death resulting from such distribution. The Government chose to supersede the original indictment on March 5, 2008, removing the "death resulting" language, and charging Krieger simply with knowingly and intentionally distributing fentanyl. Krieger indicated that she would plead guilty to the charge. The Government gave notice of its intention to ask the Court at sentencing to enhance Krieger's sentence under 18 U.S.C. § 841(b)(1)(C) to a mandatory minimum of twenty years imprisonment because a death resulted from the distribution. Krieger indicated that she would object to the application of the mandatory minimum. On November 18, 2008, Krieger entered a plea of guilty to the charge of distribution of divers amounts of fentanyl. That same day, the Court began a two-day sentencing hearing. The Court has considered the evidence and arguments presented at the hearing, and is prepared to rule.

## BACKGROUND

In 1986, Len Bias was an All-American college basketball player from the University of

Maryland.  Bias was selected by the defending NBA-champion Boston Celtics as the second overall pick in the 1986 NBA draft.  Less than 48 hours after his selection by the Celtics, Bias died in a dormitory on the University of Maryland campus from a cocaine overdose.  He was only 22 years old at the time of his death.  In a span of 48 hours, Len Bias went from being the next face of a storied NBA franchise to being the face of the nation's drug problem.  His death was a catalyst behind the passage of the Anti-Drug Abuse Act of 1986, a piece of legislation that introduced high mandatory minimum sentences for certain drug-related crimes.  Illegal drug abuse continues to be a problem in the United States.  This fact was once again exposed in November, 2005, when a young woman, Jennifer Curry, died in West Frankfort, Illinois of an apparent drug overdose.

**I.       Jennifer Krieger and Jennifer Curry**

The defendant, Jennifer Krieger, has lived a difficult life.  A tumultuous upbringing ushered in serious psychological and physical problems for Krieger.  Those, in turn, led to a serious drug addiction.  Krieger utilized the prescription pain medication fentanyl to manage the pain associated with her degenerative disk disease and her severe spinal cord problems.  She was first prescribed fentanyl in the form of a Duragesic patch in January, 2005.  Her prescription was for fifteen one-hundred-microgram patches per month.  One-hundred-microgram Duragesic patches are designed to release one-hundred-micrograms of fentanyl every hour for seventy-two hours.  However, by the summer of 2005, Krieger had learned that there was an illegal market for the patches by addicts who would ingest them to obtain a high.  Krieger began selling her prescription fentanyl for fifty dollars a patch.  Soon the word spread that Krieger had Duragesic patches for sale. Within days of Krieger's filling her prescription each month, she had sold,

traded, or given away all of the patches.

Jennifer Curry and Jennifer Krieger were friends. By all accounts, Ms. Curry was raised by a loving and caring family. Nonetheless, she made some bad choices that resulted in her becoming a troubled young woman with a serious drug addiction problem. Curry was on a dangerous road. Her father told investigators that she often stayed out all night and slept all day. A few days prior to her death, Curry was assaulted by her former boyfriend and was hospitalized. On November 22, 2005, Krieger filled her prescription for the Duragesic patches. On the afternoon of that same day, Krieger met up with Curry and gave Curry one of the patches. The two women, along with some other friends, stopped at three bars that evening. Krieger remained with Curry from the time she gave her the patch until around midnight. Joshua Owens saw Curry leave Hurley's Show Bar in the early morning hours of November 23 in the company of two males.

No one knows exactly what happened in the hours after Ms. Curry left Hurley's Show Bar. But, at some point, she returned to her parent's residence. Her mother discovered Curry's lifeless body on the couch at around four o'clock in the afternoon of November 23. Ms. Curry's father called 911, and West Frankfort police officers arrived on the scene a short time later. The coroner pronounced Jennifer Curry dead at the scene.

## II.     The Investigation

The West Frankfort police conducted an investigation. One of the police officers conducted a search of the residence and located Ms. Curry's purse. Inside the purse, among other things, the officer found an open Duragesic patch container, a Duragesic patch, and a hypodermic syringe. Michael Dinn, the West Frankfort police chief at the time, testified that the

3

patch looked "chewed up." Four items found in Curry's purse were taken into evidence: the two

items pertaining to the Duragesic patch, the syringe, and a "one-hitter" pipe with burnt residue

on it. Officers also found two red capsules in Curry's bedroom, but the capsules were not taken

into evidence and were not tested. Dinn testified that the only items sent to the evidence lab by

his department for testing were those pertaining to the fentanyl. The syringe was not tested at

the time, a fact that Dinn attributes to "inadequate police work." It was finally sent off for

testing almost three years later at the request of the United States Attorney's office. Ms. Curry's

body was transported to the Franklin County Hospital. Dr. John Heidingsfelder, a medical

doctor and pathologist, conducted an autopsy examination of the body on Friday, November 25,

2005. Dr. Heidingsfelder's medical opinion that the cause of Curry's death was fentanyl

toxicity is the basis for the Government's contention that the drug distribution admitted to by

Krieger resulted in a death, thus triggering the mandatory minimum sentence of 20 years under

18 U.S.C. §841(b). The lynch pin of Krieger's defense is that Dr. Heidingsfelder lacks

credibility.

## III.    The Evidence

Dr. Heidingsfelder testified that prior to performing the autopsy on Curry, he was

informed that a syringe and needle and a morphine patch were found near Curry's body. Dr.

Heidingsfelder testified that the term "morphine" is used interchangeably with "fentanyl." He

was told that the morphine patch appeared to be chewed up. He was also informed, erroneously,

that Curry's body was discovered on Thursday, November 24, when, actually, her body was

discovered on Wednesday, November 23. Dr. Heidingsfelder testified that during his surgical

pathology he found no external traumatic injuries that would account for Curry's death. He did

4

note pulmonary edema and congestion, as well as a bluish discoloration of the fingernails, findings consistent with a possible drug overdose. He also found needle marks on Curry's left elbow. Following his normal and customary procedures, Dr. Heidingsfelder collected blood samples and vitreous fluid samples, placed them in vials, secured them, and transported them to the AIT laboratory in Indianapolis, Indiana.

Dr. Heidingsfelder testified that the AIT lab reported finding fentanyl in Curry's blood in the amount of 13.1 nanograms per milliliter. The therapeutic range for fentanyl is listed from 1 to 3 nanograms per milliliter. The amount of fentanyl reported in Curry's blood was in the toxic to lethal range. The AIT report also indicated the presence of several other drugs, or their breakdown products, in Curry's system including oxycodone, valium, marijuana and cocaine. Dr. Heidingsfelder testified that the AIT toxicology report was integral to his determination as to the cause of Curry's death. He testified that in his opinion, Curry's death was caused by fentanyl toxicity. He further testified that, in his opinion, the other drugs found in Curry's system did not cause her death, either taken alone or in combination.

The defense relies heavily on the testimony of Dr. Long. Dr. Long, a toxicologist, was critical of Dr. Heidingsfelder's autopsy procedure, opining that more chemically stable blood samples could have been drawn had Dr. Heidingsfelder chosen a different draw site. He criticized Dr. Heidingsfelder for failing to test the needle marks found on Curry's body. Dr. Long opined that the blood samples may have been mishandled or placed in vials with the wrong preservative. Dr. Long also opined that the AIT and FBI lab reports were incomplete and inconsistent with one another. However, Dr. Long also testified that both the AIT and FBI lab reports showed the presence of fentanyl in Curry's system in amounts more than four times the

5

therapeutic range for the drug and, therefore, potentially lethal.

Unrelated to the Curry autopsy, Dr. Heidingsfelder was, on May 5, 2008, by agreement, suspended for 60 days from the practice of medicine in the state of Indiana for violating medical ethical standards. Dr. Heidingsfelder had engaged in sexual contact with a patient under his care, and provided hydrocodone and other narcotic drugs to a woman with whom he had a personal relationship. The woman committed suicide after Dr. Heidingsfelder terminated their relationship. Additionally, Dr. Heidingsfelder, who was facing legal action by the Internal Revenue Service, moved to the Cayman Islands in February, 2006. Consequently, the prosecutors in this case were unable to locate him as they prepared for trial. On direct examination as well as on cross examination, Dr. Heidingsfelder testified that his move to the Cayman Islands was strictly a business venture, having nothing to do with his legal troubles with the IRS or his problems with the Indiana medical licensing agency. After Dr. Heidingsfelder returned to this country, the Government requested his arrest as a material witness pending the sentencing hearing in this case.

IV.    The Court's Findings

To say that Dr. Heidingsfelder has an interesting history and some credibility issues is an understatement. The Court finds that Dr. Heidingsfelder's testimony and explanations regarding his move to the Cayman Islands are not credible. Additionally, Dr. Heidingsfelder's defense of his medical procedures and practices that led to the suspension of his medical license is not believable. Dr. Heidingsfelder's demeanor and manner while testifying on these matters indicated to the Court that he was not being truthful. The Court joins the IRS in its assessment of Dr. Heidingsfelder as a liar on the issue of his tax problems.

Nonetheless, just as juries are instructed that they may find a witness's testimony to be truthful in whole, in part, or not at all, so too may the Court find a witness's testimony to be credible on certain issues but not on others. With respect to Dr. Heidingsfelder, the Court finds that his testimony regarding issues not related to the autopsy he conducted on Ms. Curry is not credible. However, the Court finds that his testimony as to how he conducted the autopsy and how he arrived at his conclusion as to the cause of Ms. Curry's death is credible. In addition, the Court finds that the evidence presented, including the testimonies of Drs. LeVaughn, Evans and Morris-Kukoski, and the lab reports from AIT and the FBI, support, by a preponderance of the evidence, Dr. Heidingsfelder's conclusion that fentanyl toxicity was the cause of Ms. Curry's death.

The Court has taken into account the defense's evidence regarding the possible mishandling of blood samples, the failure to test the needle marks, the less-than-ideal blood draw site, the fact that the time of death was actually twenty-four hours earlier than was reported to Dr. Heidingsfelder, and the inconsistencies between the FBI lab reports and the AIT lab reports. Additionally, the Court has considered the fact that the AIT lab did not test the vitreous fluid for the presence of fentanyl, as well as the fact that the FBI lab was directed by the Government to test the vitreous fluid for the presence of fentanyl to the exclusion of other drugs. The Court has considered the expert testimonies as to how post-mortem redistribution may have affected the apparent amounts of the various drugs found in Ms. Curry's system. The Court has also considered the conflicting evidence as regards the proper taking and preserving of blood samples and the conflicting testimony as to whether the color coding of the sample vial caps is standardized or not.

7

Having weighed all the evidence presented, the Court finds that the Government has established that it is more probable than not that Ms. Krieger's distribution of fentanyl to Ms. Curry resulted in Ms. Curry's death. *See United States v. Schroeder*, 536 F.3d 746, 753 (7th Cir. 2008) ("The preponderance of the evidence standard requires 'that the fact-finder believe that the existence of a fact is more probable than the non-existence of that fact.'" (*quoting United States v. Smith*, 267 F.3d 1154, 1161 (D.C. Cir. 2001)). However, had the Court applied the reasonable doubt standard, the Government would not have met its burden of proof in establishing that Ms. Krieger's distribution of fentanyl to Ms. Curry resulted in the latter's death. The Court would have found that the discrepancies in the evidence and the conflicting testimonies of the witnesses raised a reasonable doubt as to the existence of this fact.

**ANALYSIS**

Under Seventh Circuit precedent "judges may find facts, by a preponderance of the evidence, that subject a defendant to a statutory mandatory minimum." *United States v. Clark*, 538 F.3d 803, 811-12 (7th Cir. 2008). "*Apprendi* has no application where a drug dealer is given a sentence at or below the maximum provided in § 841(b)(1)(C)." *Id*. Furthermore, once a judge has made a finding that results in the application of a mandatory minimum, failure of the judge to impose the mandatory minimum is clear error and will be reversed on appeal. *Id.* at 810. Although the holding in *Clark* centered on drug quantity, there is no reason to think that the Seventh Circuit would treat "death resulting" any differently. Both are found, not in the "Unlawful Acts" portion of the statute (18 U.S.C. § 841(a)), but in the "Penalties" portion (18 U.S.C. § 841 (b)). It is untenable that Congress intended to set out a different crime with different elements in the "penalty" portion of another crime. The only reason the Court would have to consider "death

resulting" to be an element of a separate crime rather than a sentencing factor is if it ran afoul of

*Apprendi*. But, *Clark* clearly says that a sentence at the statutory maximum does not run afoul of

*Apprendi*.

Therefore, the Court, upon a finding that the drug distributed by Krieger resulted in the

death of Jennifer Curry, is mandated by Congress to sentence Krieger to the statutory minimum

of twenty years. The Court has no discretion in the matter. The Seventh Circuit and the plurality

of the Supreme Court in *Harris v. U.S.*, 536 U.S. 545 (2002), have both assured the Court that

the Constitution is satisfied so long as the sentence actually imposed on Krieger is within the

statutory range specified for the crime to which she pled guilty. In this case, the upper range of

the applicable statutory range is twenty years. The mandatory minimum to which Krieger is

subject is twenty years. Therefore, the Constitution is seemingly satisfied.

It is, however, worth noting that the United States Sentencing Commission apparently

believes that "death resulting" may either be treated as a sentencing factor or as an element of an

aggravated crime. The Court reaches this conclusion because the Guidelines Manual Section

2D1.1(a)(2) sets forth an enhanced base offense level of 38 for convictions under 21 U.S.C. §

841(b)(1)(C) where death resulted from the underlying drug crime. The implication is that the

Court will need to calculate an appropriate guideline range even when the "death resulting"

factor has been proved. However, under this Court's understanding of Seventh Circuit

precedent, once the Government has established the fact that a death resulted from the

distribution, the available sentencing range for the underlying conviction contracts to a single

point - twenty years. Since the Court has no discretion to sentence the defendant to anything

other than twenty years, there would be no need for the Court to find the appropriate guideline

9

range. The Sentencing Commissions's apparent understanding that "death resulting" may be treated as either a sentencing factor to be proven by a preponderance of the evidence and resulting in an increased base offense level, or as an element of an aggravated crime to be proven beyond a reasonable doubt and resulting in the application of a statutory mandatory minimum perhaps reflects the expectations of society.

As the dissent in *Harris* addresses, society has certain expectations that there must exist a "necessary link between punishment and crime." *Harris* v. U.S., 536 U.S. at 576 (Thomas, J. dissenting). Here, one cannot escape the conclusion that Krieger, while convicted of distribution of divers amounts of narcotics, is being sentenced for homicide. However, Krieger was never charged with, nor did she plead guilty to, causing the death of Jennifer Curry. Indeed if she had been so charged, the Government would not have been able to meet its burden of proving those charges beyond a reasonable doubt. Instead, the Government presented Curry's death as a sentencing factor, to be proved to the Court by a preponderance of the evidence. The Government has met that burden. The Court cannot hide from the evidence before it. But, had the Court the discretion to insist that the Government prove beyond a reasonable doubt that the distribution to which Krieger pled guilty resulted in Curry's death before imposing the statutory mandatory minimum sentence, it would have exercised such discretion in this case.

There is a difference between the factor that most often raises the possibility of a mandatory minimum sentence under § 841(b) - drug quantity, and the factor at issue here - death resulting from the distribution. When a defendant pleads guilty to, or is found guilty by a jury of, distributing divers amounts of drugs, there is no question but that some amount of drug is at issue. After all, that is the meaning of the phrase "divers amounts." The finding of a specific

10

amount of drugs flows logically from the underlying crime of conviction. The same cannot be said of "death resulting" from the distribution. The underlying conviction in no way logically leads to the determination of whether a death resulted from that distribution. Instead, the societal expectation is that, if the Government believes a defendant to be guilty of an offense that resulted in the death of another, it would so charge in the indictment. It should be noted that the original indictment against Krieger did charge her with the aggravated crime of distribution of narcotics that resulted in the death of Jennifer Curry. It was not until it appeared as though the Government would be unable to prove the aggravating factor beyond a reasonable doubt that the superseding indictment for simple distribution was returned.

In addition, the statute imposes the minimum sentence of twenty years not when the defendant "causes" the death at issue, but when the death "results" from the distribution. Dr. Long testified at the sentencing hearing that the high levels of fentanyl found in Curry's system were not necessarily indicative of the cause of death. He said:

> For example, we may have a very high concentration of a particular drug, a fatal level. And then we say, "Well, he was hit by a train." Well, of course, you know what killed him. It wasn't the drug. It was the train.

However, for purposes of this statutory mandatory minimum, the Government need not prove that Krieger "caused" Curry's death, only that Curry's death "resulted" from Krieger's action. Therefore, if the victim in Dr. Long's hypothetical had fallen asleep on the train track because of the fentanyl, we would say the train "caused" her death, but her death "resulted" from the fentanyl.

That is analogous to what happened here. Curry heavily abused drugs of all sorts. Krieger supplied her this particular drug on this particular night. Krieger gave Curry the bullet

in the form of the fentanyl, but Curry loaded the gun and pulled the trigger herself. The statute imposes on the Government no need to show that the defendant had any degree of *mens rea*. It imposes no requirement of foreseeability. It imposes no requirement of causation. Yet it can result in the imposition of a mandatory term of twenty years incarceration.

It is not the Court's position that Jennifer Curry's death is not a proper sentencing factor. It clearly is. The Court would not quarrel with holding the Government to a preponderance of the evidence standard if the "death resulting" factor increased Krieger's base offense level but left intact the Court's discretion to fashion the appropriate sentence. This appears to be what the Sentencing Commission envisioned. Nor would the Court quarrel with holding the Government to a preponderance of the evidence standard if the "death resulting" factor could be considered on par with the other factors enumerated in 18 U.S.C. § 3553(a). Jennifer Curry's death would have factored, and factored heavily, when the Court fashioned the appropriate sentence for Jennifer Krieger. However, because the "death resulting" factor completely controls the ultimate sentence, the Court believes that both societal expectations and justice require that the Government prove that fact beyond a reasonable doubt. To reiterate, the "death resulting" factor does not flow inexorably from the underlying crime of conviction and is very broadly applicable. Therefore, the Court, had it the discretion to do so, would insist that the Government prove it beyond a reasonable doubt before making the finding that results in the imposition of a mandatory twenty year sentence. The Court believes the Government would not have been able to meet that higher burden of proof.

The Court knows of no precedent that would allow it to insist that the Government meet a higher burden of proof for sentencing factors that result in the imposition of a statutory

mandatory minimum even where, as here, the factor does not inexorably flow from the crime of conviction. Nor even where, as here, the factor is so broadly applicable. Nor even where, as here, the sentencing factor is the tail that wags the dog.

Under the facts and circumstances of this case, a twenty year sentence for Ms. Krieger is unduly harsh. However, the Court can understand why the Government pressed for the application of the "death resulting" enhancement. The pre-sentence report prepared by probation reflected a base offense level 12, criminal history category I, with an advisory guideline range of 10 to 16 months. Were the Court to have reduced the base offense level by two points for acceptance of responsibility, Krieger's adjusted guideline range would have been 6 to 12 months. Any sentence within either of those advisory ranges would be unreasonably low.

However, had the Court the discretion to sentence Krieger within the entire statutory range for the crime to which she pled guilty, it would have applied the adjusted base offense level called for in U.S.S.G. § 2D1.1(a)(2), finding that the Government has established the "death resulting" factor by a preponderance of the evidence. As a result, Krieger's base offense level would have been 38. The Court would have given her three points off for acceptance of responsibility. As a result the Court would have found a net offense level of 35, criminal history category I, with an advisory guideline range of 168 to 210 months.

However, because of the findings made by the Court based on a preponderance of the evidence standard, the Court has no discretion to sentence Krieger to anything but the twenty-year mandatory minimum sentence; a sentence which is also the maximum allowed for the crime to which Krieger pled guilty.

13

**CONCLUSION**

The Court hereby grants the Government's objections to the pre-sentence report.  In all other respects the Court adopts the findings in the pre-sentence report as the findings of this Court.  Therefore, the Court, having found that the Government has proved by a preponderance of the evidence that the distribution of fentanyl to which Krieger pled guilty resulted in the death of Jennifer Curry, is mandated by statute under 21 U.S.C. § 841(b)(1)(C) to sentence Krieger to a term of imprisonment of twenty years.  A hearing for the Court to receive the defendant's allocution and formal sentencing is set for February 2, 2009 at 10:00 a.m.

**IT IS SO ORDERED.**
**DATED: January 16, 2009**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**